The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYNDI WALTERS, an individual person,

               Plaintiff,

     v.

WASHINGTON STATE DEPARTMENT
OF CORRECTIONS; JOSEPH D.
LEHMAN; ELDON VAIL; ANNE L.
FIALA; LYNNE DELANO; MARJORIE
LITTREL; JAMES G. BLODGETT, SR.;
MARY SUTLIFF; and AMY F. COOK,

              Defendants.

Case No. C06-1448-JCC

ORDER GRANTING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT

     This matter comes before the Court on Defendants' Motion for Partial Summary Judgment (Dkt. No. 48), Plaintiff's Response (Dkt. No. 55), and Defendants' Reply (Dkt. No. 59). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS Defendants' motion for the reasons explained herein.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE - 1

## I.    BACKGROUND

From 1998 until 2003, Plaintiff Cyndi Walters was employed by the Washington State Department of Corrections ("DOC") as a Staff Counselor and as the State Director for the Staff Resource Centers ("SRC"). (Am. Compl. ¶ 1 (Dkt. No. 2 at 1).) In these capacities, Plaintiff personally provided counseling to other DOC employees about critical incidents, individual stress, and workplace issues (*id.* ¶ 20) and helped draft a confidentiality policy for the SRC to ensure that employees who sought counseling would not be negatively impacted by that decision (*id.* ¶ 21).

On February 10, 2003, Plaintiff and another DOC employee, Defendant Mary Sutliff, had a conversation, the contents of which are disputed. (*Id.* ¶ 56.) Earlier that month, an incident had arisen involving Defendant Joseph Lehman Sr., the Secretary of DOC, when his son was arrested for sexually assaulting his own two-month-old daughter. (*Id.* ¶ 46.) On February 6 and 7, 2003, Plaintiff visited DOC headquarters in Olympia to promote the availability of SRC resources and to offer Mr. Lehman counseling, but he was unavailable. (*Id.* ¶¶ 49, 50, 52, 53.) When Plaintiff returned to the Walla Walla Field Office on February 10, 2003, she met with Ms. Sutliff, who handled the field office's informational technologies issues, to discuss repairs to Plaintiff's telephone and office equipment. (*Id.* ¶ 56.) Ms. Sutliff claims that during their conversation, Plaintiff explained that she was late coming back from Olympia because she had been dealing with the recent crisis surrounding Mr. Lehman's son. (2/19/03 Sutliff E-mail (Dkt. No. 57 at 12).) Plaintiff allegedly related that she had been assisting various administrators in Olympia, listing them by name. (*Id.*) She also allegedly stated that Mr. Lehman was "hiding" in order to avoid discussing the situation. (*Id.*) Ms. Sutliff claims that she responded only by saying that she felt bad for Mr. Lehman's family, who must have been devastated. (*Id.*)

On February 19, 2003, Ms. Sutliff e-mailed her supervisor, Hayley Shepard, to report her conversation with Plaintiff. (*Id.*) In that e-mail, Ms. Sutliff explained that she had not

wanted to discuss the crisis with Plaintiff and that she was "appalled" by Plaintiff's

disclosures, which she felt were "inappropriate and unnecessary . . . , especially considering

[Plaintiff's] position [in DOC]." (*Id.*)

Ms. Sutliff's e-mail formed the basis for an employee conduct investigation. On March

3, 2003, Defendant Marjorie Littrell, the DOC Southeast Regional Administrator, prepared an

Employee Conduct Report ("ECR"), describing Ms. Sutliff's allegations and declaring that the

alleged disclosure "violate[d] [DOC] policy 870.800 by sharing information regarding specific

individuals [Plaintiff] ha[d] worked with in an official capacity, or information about staff that

[she was] aware of from [her] role as the State Director." (First ECR (Dkt. No. 57 at 10).) Ms.

Littrell also requested that Defendant Jim Blodgett, the West Central Regional Administrator,

investigate the allegations. (Am. Compl. ¶ 74 (Dkt. No. 2 at 21).) Over the course of his

investigation, Mr. Blodgett interviewed Plaintiff, Ms. Sutliff, Ms. Shepard, and Debbie

Pritchard, Ms. Shepard's supervisor. (Conduct Investigation Report (Dkt. No. 57 at 11).)

Plaintiff denied the allegations as "completely false," claiming that Ms. Sutliff, Ms. Shepard,

and Ms. Littrell had fabricated the incident in order to "get her." (*Id.* at 2.) Plaintiff claimed

that, during their conversation, it was Ms. Sutliff who had repeatedly brought up the incident

with Mr. Lehman and that, in response, Plaintiff had only stated that "yes, there are a lot of

people grieving over this situation." (*Id.* at 4–5.) Plaintiff denied disclosing the identities of

any DOC employees she had counseled and denied ever saying that Mr. Lehman was "hiding."

(*Id.*) As for why Ms. Sutliff would fabricate the allegations, Plaintiff claimed she was not as

popular as Plaintiff or her husband in high school and so she guessed Ms. Sutliff "wanted to

feel more important." (*Id.* at 5.) Plaintiff also claimed that Ms. Littrell and Ms. Shepard had

been on a "witch hunt" to get her for over two years. (*Id.*) In Mr. Blodgett's investigation

report, he summarized his various interviews and concluded that he could not find anything to

contradict the contents of Ms. Sutliff's e-mail. (*Id.* at 8.) Mr. Blodgett also reported that he

could find "no evidence of collusion or any other effort to manufacture documentation to discredit [Plaintiff]." (*Id.* at 9.)

After the investigation, on May 12, 2003, Plaintiff was given an opportunity to discuss the incident with Defendant Anne Fiala, the Assistant Deputy Secretary of DOC, and Bobbi Collins, DOC's Southeast Regional Human Resources Manager. (Second ECR (Dkt. No. 57 at 20).) Before the meeting, Plaintiff was provided with a copy of Mr. Blodgett's report. (*Id.*) After hearing Plaintiff's description of the events, Ms. Fiala found her explanations not to be credible. (*Id.*) She concluded that "[w]hile [Plaintiff was] acutely aware of the confidentiality requirements of [her] position, . . . [she] did share the information alleged . . . ." (*Id.*)

On July 18, 2003, Ms. Fiala advised Plaintiff that she had made a preliminary decision to dismiss her from her position as a result of the incident. (9/22/03 Final Termination Letter 6 (Dkt. No. 57 at 27).) On September 11, 2003, Plaintiff and her counsel were provided an opportunity to challenge the preliminary decision. (*Id.*) According to Ms. Fiala, at this meeting, Plaintiff "revisited statements that [she] had previously provided, [but] did not provide any new substantive information." (*Id.*)

On September 22, 2003, Ms. Fiala sent Plaintiff official notification that she was being dismissed from her position at DOC. (*Id.* at 1.) Ms. Fiala informed Plaintiff that the disciplinary action was taken because she had "neglected [her] duty and violated Agency policy when [she] shared information regarding a crisis situation in DOC headquarters . . . ." (*Id.*) Ms. Fiala rejected Plaintiff's claims that the allegations were fabricated or motivated by ill will, specifically finding the suggestion that Ms. Sutliff was acting based on jealousy surrounding Plaintiff's high-school popularity "unsubstantiated and far-fetched." (*Id.* at 2.) Ms. Fiala found Plaintiff's violations of confidentiality "appalling and egregious" and found her comments about Mr. Lehman hiding "inappropriate, indiscreet, and petty gossip beneath someone in your position within [DOC]." (*Id.*) The letter also reviewed Plaintiff's personnel file and emphasized that she had been reprimanded on several occasions, including multiple

incidents where she refused to disclose information about her employment activities to her supervisor on the grounds that such disclosure would violate DOC's confidentiality policy. (*See id.* at 3 ("'As your supervisor, . . . I have a right to see the names of the clients accessing services provided by the state. It would be unethical of me to allow any employee to work without accountability measures. . . . I can only interpret your response to my directive as a refusal and another effort at obfuscation and evasion of being accountable.'"); *id.* at 4 ("'I believe you hurt your own credibility and that of the Staff Counseling Program when you inappropriately use the confidentiality statutes and WAC's.'").) Ms. Fiala's letter concluded:

> This incident, coupled with [the other incidents in the personnel file], have severely damaged your credibility as a professional who can be trusted to manage a program as sensitive and vital to our staff members as the Staff Counseling Program. . . . I have been shocked throughout this process, not only by your indiscretion with regard to the incident, but particularly with your lack of integrity and forthrightness. I believe your credibility with this Agency has been damaged irreparably as a result of your conduct. While I considered demoting you as an alternative to a dismissal, to do so would continue to place you in a position in which nearly an equal level of trust and discretion is required. I do not trust that such an action would have been favorable to the program itself. As such, I have no alternative but to dismiss you from your position. Any lesser sanction would not reflect the seriousness with which I view your offense, prevent recurrence, deter others, and maintain respect for our agency program.

(*Id.* at 6.)

Plaintiff appealed her termination to the Personnel Appeals Board ("PAB"). (PAB Order 1 (Dkt. No. 49-2 at 2).) PAB member Busse Nutley presided over the five-day hearing; PAB Vice Chair Gerald Morgen listened to the recorded proceedings, reviewed the file, and participated in the decision. (*Id.*) At the hearing, Plaintiff was represented by counsel. (*Id.*) After hearing testimony from fifteen witnesses, the PAB denied the appeal. (*Id.* at 9.) The Board "f[ound] Ms. Sutliff's testimony . . . to be consistent and credible" and "d[id] not find any motive for Ms. Sutliff to be untruthful about her discussion with [Plaintiff]"; in contrast, it "f[ound] inconsistencies in [Plaintiff's] version of the conversation." (*Id.* at 6.) Having credited Ms. Sutliff's account, the PAB held that Plaintiff's "decision to discuss [the situation involving

Mr. Lehman's son] was highly inappropriate and unethical." (*Id.* at 9.) The Board found that Plaintiff had a clear understanding of DOC's policy on confidentiality, but that "[d]espite the policy, [Plaintiff] gave DOC employees the impression she went to headquarters to perform counseling services and then proceeded to discuss the situation and specific names with Ms. Sutliff, which was contrary to the intent of the policy." (*Id.*) These "actions harmed her credibility, damaged her effectiveness as Statewide Director, and undermined the credibility of the Staff Counseling Program." (*Id.*) The Board concluded that "[u]nder the totality of the proven facts and circumstances, . . . dismissal is the appropriate disciplinary sanction." (*Id.* at 9.)

Plaintiff then appealed the PAB's decision to the Thurston County Superior Court, where the case was heard by Judge Paula Casey. (6/30/06 Tr. 1 (Dkt. No. 58 at 23).) The appeal initially focused on the merits of the dismissal, but, after Judge Casey had reviewed the record in its entirety, Plaintiff moved to vacate the PAB's order based on an alleged conflict of interest between Ms. Nutley, the presiding member, and Mr. Lehman. (*Id.* at 2.) When Plaintiff had first called Mr. Lehman to testify before the PAB on her behalf, Ms. Nutley stated that she would "like to acknowledge for the record that Mr. Lehman and I spent time together in the Governor's Cabinet." (Ct. App. Order 8 (Dkt. No. 49-5 at 9).) As she formally introduced the panel to Mr. Lehman, she stated, "So, you know me, Busse Nutley." (*Id.*) Finally, at the end of DOC's cross-examination, Ms. Nutley thanked Mr. Lehman for his time, to which he responded that it was "[g]ood to see [her] again," and to which she replied "[h]opefully, we'll see each other under less formal circumstances." (*Id.* at 9.) At the time, Plaintiff's attorney did not object nor inquire further into Ms. Nutley's relationship with Mr. Lehman. (6/30/06 Tr. 6 (Dkt. No. 58 at 28).) However, after the fact, Plaintiff learned that, as part of their cabinet positions, Ms. Nutley and Mr. Lehman served together as members of a partnership called "Housing for High Risk Offenders: A Partnership for Community Safety." (Ct. App. Order 10 (Dkt. No. 49-5 at 11).) The partnership, which was intended to address the lack of affordable

and stable housing for high risk sex offenders and mentally ill offenders, met four times before issuing its final report in July 2002. (*Id.* at 10–11.) Plaintiff argued before Judge Casey that this prior interaction between Ms. Nutley and Mr. Lehman created "a blatant conflict-of-interest" that gave rise to "an appalling appearance of partiality, tainting the PAB and bringing disrepute to the entire judicial process." (Mot. to Vacate 2–3 (Dkt. No. 58 at 9–10).) Moreover, Plaintiff argued that Ms. Nutley's disclosures at the hearing were "deceptive" and "misleading" and affirmatively made to "conceal [her] connection [with Mr. Lehman]." (*Id.* at 9; 6/30/06 Tr. 2 (Dkt. No. 58 at 24).)

After hearing argument on the fairness issue, Judge Casey concluded that, despite Plaintiff's motion coming so late in the litigation, the failure to disclose was "significant." (6/30/06 Tr. 8 (Dkt. No. 58 at 30).) The court noted that Mr. Lehman was a central figure in the incident as the subject of the conversation that ultimately led to Plaintiff's termination. (*Id.* at 7–8.) "[W]ithout determining that Ms. Nutley was, in fact, biased," Judge Casey held that the "failure to disclose this additional relationship with Mr. Lehman does require vacation of the [PAB's] order . . . ." (*Id.* at 8.) The Court also issued an advisory opinion as to the merits, stating that "[i]f [she] were ruling on the substantive issues of this appeal, [she] would find that the Board erred . . . ." (9/7/06 Tr. 49 (Dkt. No. 49-4 at 50).) She acknowledged that Plaintiff's statements to Ms. Sutliff were "probably inappropriate," but held that the specific DOC policy on which the PAB based its finding could not be violated without a disclosure of confidential information. (*Id.* at 48.) Plaintiff had not actually met with Mr. Lehman, and "[w]ithout meeting with Secretary Lehman, there was no confidential information to disclose and there could be no violation of the policy. (*Id.* at 49.)

The DOC appealed Judge Casey's rulings to the Washington Court of Appeals, which reversed both as to the fairness issue and as to the merits of the termination. (Ct. App. Order 1–2 (Dkt. No. 49-5 at 2–3).) As to the fairness of the PAB hearing, the court noted that Ms. "Nutley disclosed her prior professional relation on the Governor's Cabinet with [Mr.] Lehman

when [Plaintiff] called him as her witness and [Plaintiff] did not object or inquire further into the nature of their relationship. By agreeing to continue with the hearing without objection, [Plaintiff] waived her right to raise this issue on appeal." (*Id.* at 12.) In a footnote, the court also held that "even if we were to hold that [Plaintiff] properly preserved this issue for appeal, [Ms.] Nutley's prior professional relationship with [Mr.] Lehman does not violate the appearance of fairness doctrine, the CJC, or [Plaintiff's] right to due process." (*Id.* at 14 n.10.) The court noted that the prior professional relationship in question "was several years removed and only tangentially related to [Plaintiff's] dismissal, and there is no objective evidence that [Ms.] Nutley was actually or potentially biased." (*Id.*)

As to the merits of Plaintiff's termination, the state court of appeals found that substantial evidence supported the PAB's findings crediting Ms. Sutliff's account of the conversation. (*Id.* at 15.) The court analyzed DOC's confidentiality policy and held that it "protects not only confidential communications occurring during a counseling session but also all communications that identify a person or anything about specific issues regarding that person's contact with the SRC, including communications that identify an individual to whom counseling services were offered and the reasons why those services were offered." (*Id.* at 17.) Applying the policy to the facts of the case, the court of appeals found that "[b]y revealing the names of individuals to whom she offered, but who refused services, [Plaintiff] violated [the DOC policy]." (*Id.* at 18.) Moreover, the court found that even if Plaintiff's conduct had not explicitly violated the policy, it would still constitute a neglect of duty sufficient to support termination. (*Id.*) Plaintiff had an explicit duty to "maintain the highest standards of personal/professional and ethical conduct," and she violated that duty by disclosing information in her conversation with Ms. Sutliff that "was highly inappropriate, unprofessional, and unethical by her own standards." (*Id.* at 19.)

Plaintiff petitioned the Washington Supreme Court for review of the decision (Dkt. No. 49-6), but the petition was denied. *See Walters v. DOC*, 165 Wash. 2d 1018 (2009).

Plaintiff filed this federal action on October 5, 2006, while her appeal of the PAB decision was still pending before the Thurston County Superior Court. Plaintiff's amended complaint again rejects Ms. Sutliff's account of their conversation and claims that she was "recruited" by a conspiracy of Defendants "to provide the pretext for" Plaintiff's termination. (Am. Compl. ¶¶ 55, 59 (Dkt. No. 2 at 15–17); *see also id.* ¶ 135 ("Defendants knowingly conspired together to concoct charges and create evidence against Plaintiff and to conceal exculpatory evidence.").) Plaintiff alleges that she was discharged in violation of her procedural and substantive due process rights. (*Id.* ¶ 127.) She claims that she was actually terminated for her expression of constitutionally protected speech (*id.* ¶ 166); because of her sex (*id.* ¶ 160); and in retaliation for prior protected activity, namely her unwillingness to disclose confidential health care information (*id.* ¶ 175). Plaintiff builds on this last allegation, claiming that her dismissal constituted "wrongful termination in violation of public policy" under state law, citing Washington's "expressed public policy . . . to protect health care information." (*Id.* ¶¶ 171, 173.) Moving beyond the termination itself, Plaintiff claims that Defendants deprived her of property and liberty by intentionally conducting a sham investigation. (*Id.* ¶ 135.) She further alleges that when the case reached the PAB, "[t]he DOC Defendants and Busse Nutley actively concealed a pre-existing relationship between [Ms.] Nutley and [Mr.] Lehman" and that the "failure to disclose the relationship . . . deprived [Plaintiff] of an objective tribunal and fair hearing in violation of her due process rights." (*Id.* ¶ 113; *see also id.* ¶ 145 ("Defendants knowingly conspired among themselves to deprive Plaintiff of her due process rights to an impartial tribunal before the [PAB].").) Finally, she claims that the DOC Defendants have defamed Plaintiff by "falsely accus[ing] [her] of dishonesty, lack of integrity, and lack of accountability," and she argues that this defamation has deprived her of her constitutionally protected liberty interests. (*Id.* ¶¶ 120, 155).) She seeks

reinstatement to her position at DOC, compensatory and punitive damages, costs, litigation

expenses, attorney fees, and any further relief deemed just and proper. (*Id.* at 44.)[1]

On February 19, 2008, the parties stipulated to striking the trial date and related pretrial

deadlines until after the state court of appeals issued its decision, because "issues in this case

will be substantially affected by the outcome of the related state law action." (Stip. 2 (Dkt. No.

41).) In accordance with the parties' stipulation, the Court removed the case from its active

caseload. (Minute Order 42 (Dkt. No. 42).)

On November 11, 2008, after the Court of Appeals reinstated the PAB's order

affirming Plaintiff's termination, Defendants moved for summary judgment. (Mot. (Dkt. No.

48).) First, Defendants argue that Plaintiff's claims of wrongful termination, retaliation,

defamation, conspiracy, discrimination, and violation of the First Amendment must each be

dismissed under the doctrines of res judicata and collateral estoppel. (*Id.* at 9–13.) Second,

Defendants argue that summary judgment should be granted as to Plaintiff's procedural due

process claim because Plaintiff received ample and adequate process in this case, from Mr.

Blodgett's independent investigation up through her petition of review in the Washington

Supreme Court. (*Id.* at 13–16.) Third, Defendants argue that Plaintiff's substantive due process

claim fails because Defendants' actions did not "shock the conscience." (*Id.* at 16–17.) Finally,

Defendants claim that even if they did violate Plaintiff's due process rights, they are entitled to

qualified immunity. (*Id.* at 17–19.)

Plaintiff moved to strike Defendants' motion, arguing that she had not had sufficient

opportunity for discovery before the trial date was stricken. (Dkt. No. 50.) To accommodate

Plaintiff's concerns, the Court re-noted Defendants' motion and ordered that discovery be

---

[1] Plaintiff also brings a claim of breach of fiduciary duty and legal malpractice against
Defendant Amy Cook, an Assistant Attorney General. (Am. Compl. ¶ 184–86 (Dkt. No. 2 at
43).) This claim is not at issue in this motion. (*See* Mot. 1 n.1 (Dkt. No. 48) ("The motion for
partial summary judgment seeks to dismiss all plaintiff's claims, with the exception of her
claim against Ms. Cook alleging legal malpractice.").)

reopened for one month to allow Plaintiff an opportunity to respond. (Dkt. No. 51.) The motion now comes before the Court for consideration.

## II.    DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A defendant moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defend against the motion, the plaintiff must then go "beyond the pleadings" and demonstrate "'specific facts [in the record] showing that there is a genuine issue for trial.'" *Id.* at 24 (*quoting* FED. R. CIV. P. 26(e)(2).). The Court views the evidence in the light most favorable to the non-moving party. *Caneva*, 550 F.3d at 761.

### A.    Collateral Estoppel

Under the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered," *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984), so long as the party against whom the doctrine is asserted had a "full and fair opportunity" to litigate in the prior state court proceedings. *See Allen v. McCurry*, 449 U.S. 90, 95 (1980). Washington, like most jurisdictions, recognizes two related preclusion doctrines. Claim preclusion, often called res judicata, precludes a plaintiff from bringing a subsequent claim if "the relief sought could have and should have been determined in a prior action." *Schoeman v. New York Life Ins. Co.*, 726 P.2d 1, 3 (Wash. 1986).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PAGE - 11

Issue preclusion, known as collateral estoppel, bars "relitigation of *issues* already actually litigated by the parties and decided by a competent tribunal," *Reninger v. DOC*, 951 P.2d 782, 788 (Wash. 1998) (emphasis added), even when those issues are presented in the context of "a new, distinct claim," *Shoemaker v. City of Bremerton*, 745 P.2d 858, 860 (Wash. 1987).

Collateral estoppel affords repose to successful litigants:

> 'Such repose is justified on the sound and obvious principle of judicial policy that a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise. To hold otherwise would, as a general matter, impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution.'

*Christensen v. Grant County Hosp Dist. No. 1*, 96 P.2d 957, 961 (Wash. 2004) (*quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107–08 (1991)). The doctrine "may be applied to preclude only those issues that have actually been litigated and necessarily and finally determined in the earlier proceeding." *Id.*

> [T]he party seeking application of the doctrine must establish that (1) the issue decided in the earlier proceeding was identical to the issue presented in the later proceeding, (2) the earlier proceeding ended in a judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to, or in privity with a party to, the earlier proceeding, and (4) application of collateral estoppel does not work an injustice on the party against whom it is applied.

*Id.*

Defendants argue that Plaintiff's claims of wrongful termination in violation of public policy, retaliation, defamation, conspiracy, discrimination, and violation of the First Amendment are precluded by collateral estoppel in light of the issues decided in Plaintiff's unsuccessful administrative appeal, which was affirmed by the Washington Court of Appeals. The Court finds that (1) the decision of the state court of appeals is preclusive as to certain of its legal findings and (2) the PAB's decision is preclusive as to both its findings of fact and conclusions of law.

//

//

### 1. Court of Appeals

In upholding Plaintiff's termination, the state court of appeals adopted the PAB's findings of fact; however, under the relevant standard of review, the Board's findings needed only to be supported by "substantial evidence." (*See* Ct. App. Order 3 n.3, 15, 20 (Dkt. No. 49-5 at 4, 16, 21).) "As a general rule, issue preclusion . . . may be defeated by shifts in the burden of persuasion or by changes in the degree of persuasion required." *Dias v. Elique*, 436 F.3d 1125, 1129 (9th Cir. 2006) (internal quotation omitted). In light of this general rule, the Ninth Circuit has held that factual findings based on "substantial evidence" do not themselves preclude relitigation of those issues in subsequent proceedings where the issues would be analyzed under a more stringent standard of review. *Id.* at 1130–31. Accordingly, the court of appeals's adoption of the PAB's findings of fact does not render those findings any more or less preclusive than they would otherwise be.

The state court of appeals did make some *de novo* findings of fact; specifically, it considered the fairness of the PAB hearing and concluded that "[Ms.] Nutley's prior professional relationship with [Mr.] Lehman does not violate the appearance of fairness doctrine, the [Code of Judicial Conduct], or [Plaintiff's] right to due process." (Ct. App. Order 14 n.1 (Dkt. No. 49-5 at 15).) These findings, however, were made in a footnote after the court had held that it did not have to reach the issue because Plaintiff had not properly preserved it for appeal. (*See id.* at 14 & n.1.) Collateral estoppel only applies to issues that were "*necessarily* and finally determined in the earlier proceeding." *Christensen*, 96 P.3d at 961 (emphasis added); *see also Allen*, 449 U.S. at 94 (describing collateral estoppel as limited to decisions "necessary to [the court's] judgment"). In this case, the court of appeals made clear that its consideration of the fairness issue was unnecessary to its judgment, so its findings as to the fairness of PAB proceeding do not invoke collateral estoppel.

However, although the factual findings of the court of appeals are not preclusive, the legal conclusions that it drew from those facts are. The court of appeals held that the DOC's

"confidentiality policy protects all communication relating to staff counseling, including a potential client's refusal to engage in counseling that a counselor believes is necessary." (Ct. App. Order 16 (Dkt. No. 49-5 at 17).) The court determined that Plaintiff's behavior, as found by the PAB, violated this policy (*id.* at 17, 19), and it upheld her termination on those grounds (*id.* at 20). This Court would defer to a state court's interpretation of a state agency policy in any case under general principals of comity; here, where the state court proceeding involved the same parties litigating the same issue, the legal interpretation of DOC's confidentiality policy is entitled to even more respect. Accordingly, collateral estoppel precludes relitigation as to the scope of the confidentiality policy.

The decision by the state court of appeals also precludes relitigation as to whether the confidentiality policy, as interpreted by the Defendants, is unconstitutionally vague. Plaintiff raised that argument before the court of appeals (Pl.'s Ct. App. Brief 40–41 (Dkt. No. 58 at 163–64)), which necessarily rejected it in upholding Plaintiff's termination. Nevertheless, Plaintiff raises the exact same argument again in her federal complaint. (*See* Am. Compl. ¶ 107 (Dkt. No. 2 at 30).) In fact, the portion of Plaintiff's Response that addresses this point is copied *verbatim* from her brief before the state court of appeals. (*Compare* Resp. 20–21 (Dkt. No. 55) *with* Pl.'s Ct. App. Brief 40–41 (Dkt. No. 58 at 163–64).) This is exactly the sort of duplicative litigation that the collateral estoppel doctrine was designed to prevent; accordingly, the Court finds that Plaintiff is precluded from relitigating her argument that the DOC's confidentiality policy is void for vagueness.[2]

//

//

---

[2] Even if the Court could reach this issue, it would not find the policy unconstitutionally vague as applied to Plaintiff. The state court of appeals interpreted the policy to "protect[] all communication relating to staff counseling, including a potential client's refusal to engage in counseling that a counselor believes is necessary." (Ct. App. Order 16 (Dkt. No. 49-5 at 17).) This definition gives DOC employees adequate notice as to sorts of conduct proscribed.

### 2. PAB

The PAB also made factual findings, and, unlike the state court of appeals, its findings were based on a full "preponderance of the evidence" standard. (*See* PAB Order 8 (Dkt. No. 49-2 at 9). Under Washington state law, administrative decisions may have the same preclusive effect as court decisions. *Reninger*, 951 P.2d at 788. In determining whether to apply collateral estoppel to the finding of an administrative body, the state courts consider three criteria: "(1) whether the agency acting within its competence made a factual decision; (2) agency and court procedural differences; and (3) policy considerations." *Id.* at 789. In *Reninger*, the Washington Supreme Court applied these factors to a PAB decision upholding the termination of two DOC employees and held that the PAB's findings *did* have a preclusive effect on subsequent court proceedings. *See id.* ("'Any other result would render the administrative forum a place for meaningless dry runs of wrongful termination claims.'" (*quoting Miller v. County of Santa Cruz*, 39 F.3d 1030, 1038 (9th Cir. 1994))).

An administrative determination that would be preclusive in state court will be similarly preclusive in federal court, so long as it meets certain fairness requirements: (1) the administrative agency must have acted in a judicial capacity, (2) the agency must have resolved disputed issues properly before it, and (3) the parties must have been provided an adequate opportunity to litigate the issues. *See Miller*, 39 F.3d at 1033 (*citing United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). This "longstanding policy" "aris[es] out of concerns of comity and finality" and demonstrates a respect for the state court systems for reviewing administrative decisions. *Id.* at 1038.

Plaintiff first argues that the PAB's findings should not be given preclusive effect on the grounds that the PAB officers were not acting in a "judicial capacity." (Resp. 15 (Dkt. No. 55).) Her only support for this argument is the holding by the state court of appeals that PAB officers are not considered "judges" by the Code of Judicial Conduct. (*See* Ct. App. Order 14 n.1 (Dkt. No. 49-5).) The Court finds this argument unpersuasive, especially given that the

1    Washington Supreme Court has specifically found PAB determinations preclusive. *See*

2    *Reninger*, 951 P.2d at 791. The process offered in an agency adjudication need not be identical

3    to that offered in a formal courtroom, *see Shoemaker*, 745 P.2d at 862; the fact that PAB

4    officers are not governed by the same code of conduct as trial judges does not strip their

5    decisions of preclusive effect, *see Caldeira v. County of Kauai*, 866 F.2d 1175, 1180 (9th Cir.

6    1989) (finding that an arbitrator's decision on an issue was binding in subsequent proceedings).

7            Plaintiff also argues that the PAB's findings should not be given preclusive effect

8    because she did not receive a "full and fair opportunity" to litigate the issues before the PAB.

9    (Resp. 14 (Dkt. No. 55).) In support of this argument, she points to the same prior relationship

10   between Ms. Nutley and Mr. Lehman that she raised before Judge Casey and the state court of

11   appeals. Plaintiff argues once again that, as a result of the relationship, she "faced a biased

12   hearing officer whose findings of fact and conclusions of law parroted the DOC's absurd

13   charges." (*Id.*) The court of appeals rejected this argument, but, as described above, it did so in

14   part on procedural grounds so its decision does not invoke collateral estoppel; however, upon

15   reviewing the record, this Court reaches the same conclusion.

16           "When determining whether a party received a full and fair opportunity to litigate an

17   issue, the inquiry is whether the *minimum due process requirements* guaranteed by the

18   fourteenth amendment are satisfied." *Caldeira*, 866 F.2d at 1180 (emphasis added). Due

19   process "requires a hearing before an impartial tribunal" and "this neutrality principle has been

20   applied to . . . administrative adjudications." *Clements v. Airport Auth. of Washoe County*, 69

21   F.3d 321, 333 (9th Cir. 1995). However, to make out a claim of unconstitutional bias, Plaintiff

22   "must overcome a presumption of honesty and integrity on the part of the decision-makers" by

23   showing "that the adjudicator has prejudged, or reasonably appears to have prejudged, an

24   issue." *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (internal quotations omitted).

25           There are two ways in which a plaintiff may establish that he has been denied
             his constitutional right to a fair hearing before an impartial tribunal. [T]he
26           proceedings and surrounding circumstances may demonstrate *actual bias* on the

part of the adjudicator, [or] the adjudicator's pecuniary or personal interest in the outcome may create an *appearance of partiality* that violates due process . . . .

*Id.* (emphasis in original).

Plaintiff's complaint alleges that "the DOC defendants and [Ms.] Nutley actively concealed [the] pre-existing relationship" and that this "flagrant but undisclosed conflict of interest" "gave rise to an appalling appearance of judicial partiality, tainting the PAB and bringing disrepute to the entire adjudicative process." (Am. Compl. ¶¶ 113, 118 (Dkt. No. 2 at 32, 34).) Despite this strong language, Plaintiff points to no evidence in the record suggesting that Ms. Nutley actually "prejudged, or reasonably appears to have prejudged, [any] issue" in her case. *Stivers*, 71 F.3d at 741.

As Mr. Lehman was called to testify, Ms. Nutley explicitly "acknowledge[d] for the record that Mr. Lehman and I spent time together in the Governor's Cabinet." (Ct. App. Order 8 (Dkt. No. 49-5 at 9).) She also indicated that Mr. Lehman "knew" her (*id.*) and stated as he was leaving that she hoped to see him "under less formal circumstances" (*id.* at 9). At the time, Plaintiff made no objection to these disclosures and does not argue in this case that either their time spent together in the Governor's Cabinet or their apparent personal relationship created any conflict of interest. Plaintiff argues instead that the fact that Ms. Nutley and Mr. Lehman served together on the partnership demonstrates "a closer and more significant professional connection," but she completely fails to explain how this prior relationship would predispose Ms. Nutley against Plaintiff in the appeal of her termination. (Resp. 17 (Dkt. No. 55).) Plaintiff argued to the Court of Appeals that "[t]he negative publicity attending the arrest of Secretary Lehman's son may well have had a direct personal impact upon [Ms.] Nutley" and speculated that the partnership might have continued were it not for the arrest. (Pl.'s Ct. App. Brief 21 (Dkt. No. 58 at 144).) Given that the partnership only met four times over three months, that it had dissolved well before the arrest of Mr. Lehman's son, and that Ms. Nutley and Mr. Lehman appear to have served on the partnership only because of their cabinet positions (Ct.

App. Order 10 (Dkt. No. 49-5 at 11)), the Court finds this proposition extremely doubtful. However, even if it the arrest of Mr. Lehman's son *had* reflected negatively on Ms. Nutley, it would have done so regardless of any of Plaintiff's actions. In the end, Plaintiff has produced no evidence to suggest that Ms. Nutley had any stake in Plaintiff's termination, much less that she "actively concealed" any prejudgment or bias. Accordingly, this Court agrees with the state court of appeals that there is no appearance of partiality on the part of Ms. Nutley.

Plaintiff also suggests that the *outcome* of the PAB appeal demonstrates Ms. Nutley's actual bias. She claims that "the PAB rubber-stamped every argument and charge advanced by the DOC—however absurd or vague; ignored every legal objection and argument presented by [Plaintiff]; and rejected all testimony on her behalf." (Resp. 14 (Dkt. No. 55).) Her complaint calls the result reached by the PAB "outrageous and offensive." (Am. Compl. ¶ 118 (Dkt. No. 2 at 34).) The Ninth Circuit has made clear that even "repeated unfavorable rulings, standing alone" are insufficient to support a claim of actual bias. *See Stivers*, 71 F.3d at 741–42 (*citing McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1224 (9th Cir. 1990)). Furthermore, Plaintiff's description of the PAB proceeding appears to grossly misrepresent the record: in its final determination, the PAB simply (1) credited Ms. Sutliff's account of the conversation, and (2) determined that Plaintiff's actions, as described by Ms. Sutliff, violated the DOC's confidentiality policy. (PAB Order 6, 9 (Dkt. No. 49-2 at 7, 10).) There is nothing "outrageous" about the PAB's credibility determination. Moreover, the state court of appeals specifically endorsed the PAB's interpretation of the confidentiality policy (*see* Ct. App. Order 16 (Dkt. No. 49-5 at 19)), undercutting any argument that the ruling was so "outrageous" as to demonstrate actual evidence of bias.

Because the Court finds that Plaintiff was not denied a "full and fair opportunity" to litigate her case in the PAB hearing, the PAB's findings and conclusions preclude relitigation of those issues under the doctrine of collateral estoppel. *See Reninger*, 951 P.2d at 791. As described above, the Board determined that Ms. Sutliff's account of the conversation was

credible and that Plaintiff's account was not. (PAB Order 5–6 (Dkt. No. 49-2 at 6–7).) It found that Plaintiff violated the confidentiality policy by "giv[ing] DOC employees the impression she went to headquarters to perform counseling services and then proceed[ing] to discuss the situation and specific names of individuals with Ms. Sutliff . . . ." (*Id.* at 9.) The PAB found that these actions "harmed her credibility, damaged her effectiveness as Statewide Director, and undermined the credibility of the Staff Counseling Program." (*Id.*) Accordingly, it concluded that termination was "*the* appropriate disciplinary sanction." (*Id.* (emphasis added).)

The PAB's findings are fatal to Plaintiff's various claims that her termination was unlawful. Plaintiff continues to put forth as the gravamen of her complaint that she never disclosed confidential information to Ms. Sutliff. Instead, she claims to be the victim of a massive conspiracy (including not only her co-workers and direct supervisors but also the various individuals assigned to independently review her termination) to dismiss her based on her sex, her constitutionally protected speech, and her prior *unwillingness* to disclose confidential information. The PAB's finding that Plaintiff was appropriately terminated for her improper disclosures to Ms. Sutliff decimates Plaintiff's claims of conspiracy and improper motive. It similarly disposes of her claim that Defendants conducted a "sham investigation" into "concoct[ed] charges," because it fully credits the substance of Ms. Sutliff's allegations. Finally, Plaintiff's claim that she was wrongfully discharged in violation of the state's public policy of promoting medical privacy depends on her allegation that she was "actually fired for *defending* the integrity of the SRC program and *protecting* DOC employees." (Resp. 22 (Dkt. No. 55) (emphasis added).) This critical allegation cannot be squared with the PAB's conclusive finding that she was actually and appropriately fired for her conduct in the conversation with Ms. Sutliff. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's claims of sex discrimination, retaliation, sham investigation, and wrongful termination in violation of public policy.

//

**B.    Procedural Due Process**

In addition to her substantive challenges to the termination, Plaintiff also claims that Defendants "violated [her] constitutional rights by depriving her of property rights, including her employment with the DOC, without process, both procedurally and substantively, under color of state law." (Am. Compl. ¶ 127 (Dkt. No. 2 at 35).) The Court considers the procedural and substantive components of this claim separately, as each involves a distinct analysis.

To successfully make a procedural due process claim, Plaintiff must demonstrate that (1) she had a protected property interest in her continued employment and (2) she was deprived of that property interest without receiving all of the process that was due. *See Clements*, 69 F.3d at 331. For the purposes of this motion, Defendants concede that Plaintiff had a constitutionally protected property interest in her continued employment, so the only consideration is whether she was afforded the necessary process. The Court has already ruled that the post-termination PAB proceedings did not violate due process;[3] however, it is well established that an employee must also be given some sort of hearing *before* the termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). This pre-termination hearing "need not be elaborate"—it need only afford the employee (1) notice of the termination and (2) an opportunity to present reasons, either in person or in writing, why the proposed action should not be taken. *Id.* ("To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."); *Clements*, 69 F.3d at 332.

---

[3] Plaintiff uses the PAB proceeding as the basis for a separate procedural due process claim, alleging that "Defendants knowingly conspired among themselves to deprive Plaintiff of her due process rights to an impartial tribunal before the Personnel Appeal Board." (Am. Compl. ¶ 145 (Dkt. No. 2).) Because the Court has already held that Plaintiff was not deprived of her due process rights before the PAB, and because Plaintiff has produced no evidence whatsoever to support her conspiracy allegations, the Court GRANTS summary judgment as to this claim.

It is undisputed that Plaintiff received some form of notice of the allegations against her and several opportunities to respond to these allegations before her ultimate termination. On March 3, 2003, within two weeks of receiving Ms. Sutliff's e-mail, Ms. Littrell prepared an ECR describing Ms. Sutliff's allegations and stating that the alleged behavior violated the DOC's confidentiality policy. (First ECR (Dkt. No. 57 at 10).) While investigating the allegations, Mr. Blodgett interviewed Plaintiff and documented in his report both her account of the conversation and her accusations of a conspiracy against her. (Conduct Investigation Report 2–5 (Dkt. No. 57 at 12–15).) On May 12, 2003, Plaintiff met with Ms. Fiala and Ms. Collins to discuss the allegations and was given a copy of Mr. Blodgett's report to review before the meeting. (Second ECR (Dkt. No. 57 at 20).) On May 22, 2003, Ms. Fiala prepared a second ECR detailing her findings that Plaintiff had in fact violated the DOC confidentiality policy as described in the initial ECR. (*Id.*) On July 18, 2003, Ms. Fiala advised Plaintiff via teleconference of her preliminary decision to dismiss Plaintiff for the violation. (9/22/03 Final Termination Letter 6 (Dkt. No. 57 at 27).) A pre-termination meeting was initially scheduled for July 24, 2003, but was continued until September 11 in order to allow Plaintiff to have her counsel present. (*Id.*) At this meeting, Plaintiff's counsel presented her case as to why termination was inappropriate. (*Id.*) Only after this meeting had taken place was Plaintiff finally terminated. (*Id.* at 1.)

Plaintiff argues that, despite this extensive process, she was denied notice and an opportunity to be heard. (Resp. 6 (Dkt. No. 55).) As to the notice requirement, Plaintiff claims that she "faced constantly changing charges and accusations":

> No sooner had she been accused of and successfully rebutted one set of allegations, than another version of the facts and interpretation of policy would be asserted against her. Truly she could never win. It was a fruitless exercise out of Alice in Wonderland with one Queen after another screaming for her head.

(Resp. 7 (Dkt. No 55).)

Unfortunately for Plaintiff, she provides no evidence in the record to support these dramatic allegations. Plaintiff was finally terminated for "neglect[ing] [her] duty and violat[ing] [DOC] policy" when she "share[d] . . . that [she] had been involved in assisting staff . . . in dealing with th[e] crisis," "specifically named some of the Managers with whom [she] had met," and "informed Ms. Sutliff that Mr. Lehman was 'hiding' from people in hopes of avoiding discussion regarding the issue." (9/22/03 Final Termination Letter 1 (Dkt. No. 57 at 22).) Each of these charges was explicitly described in the initial ECR. (*See* First ECR (Dkt. No. 57 at 10) ("You [told Ms. Sutliff] that you had been involved in assisting staff in headquarters (naming some of them) with dealing with the crisis. You also proceeded to discuss with [Ms. Sutliff] that [Mr. Lehman] was 'hiding' from people in hopes to avoid discussing the situation. This violates policy 870.800 . . . .").) This ECR was prepared more than six months before her final pre-termination meeting and her subsequent dismissal; accordingly, the Court finds that Plaintiff was not deprived of adequate notice of the allegations against her.

As to her opportunity to be heard, Plaintiff alleges that she never received a "fair and honest hearing" of her arguments because "all of her efforts to explain fell upon deaf and hostile ears." (Resp. 6, 11 (Dkt. No. 55).) As described above, repeated unfavorable rulings, by themselves, are insufficient to make out a due process violation, *Stivers*, 71 F.3d at 741–42; instead, Plaintiff "must overcome a presumption of honesty and integrity" by showing "that the adjudicator has prejudged, or reasonably appears to have prejudged, an issue." *Id.* at 741 (9th Cir. 1995). Ms. Fiala was the final decision-maker as to the termination.[4] (*See* 9/22/03 Final Termination Letter 1 (Dkt. No. 57 at 22).) Plaintiff provides no evidence whatsoever to suggest

---

[4] In her complaint, Plaintiff suggests that Ms. Fiala did not have decision-making authority, and that the document purporting to delegate her such authority was a forgery. (Am. Compl. ¶ 94 (Dkt. No. 2 at 26).) Plaintiff has not raised this argument in her opposition to summary judgment and has submitted no evidence to support her allegation, so the Court ignores it. *See Celotex*, 477 U.S. at 324 (noting that the nonmoving party must "go beyond the pleadings" to defend against a motion for summary judgment).

1  actual bias, or even an appearance of bias, on Ms. Fiala's part, so the presumption of honesty

2  and integrity remains intact.

3        After receiving notice of the charges against her, Plaintiff had several pre-termination

4  opportunities to argue her case before an impartial decision-maker. Post-termination, she was

5  provided an administrative hearing before the PAB where she had a full and fair opportunity to

6  litigate her case. That is all that procedural due process requires. Accordingly, the Court

7  GRANTS Defendants' motion for summary judgment as to Plaintiff's procedural due process

8  claims.

9        **C.    Substantive Due Process**

10        Plaintiff's complaint also alleges that Defendants violated her right to substantive due

11  process. It is well established that the Due Process Clause bars "'certain government actions

12  regardless of the fairness of the procedures used to implement them.'" *County of Sacramento v.*

13  *Lewis*, 523 U.S. 833, 840 (1998) (*quoting Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The

14  constitutional guarantee of substantive due process is intended to remedy "the exercise of

15  power without any reasonable justification in the service of a legitimate governmental

16  objective." *Id.* at 846. However, "only the most egregious official conduct can be said to be

17  arbitrary in the constitutional sense," so, to make out a claim that she was deprived of her

18  property in violation of substantive due process, Plaintiff must demonstrate that the official

19  conduct in question "shocks the conscience." *Id.* (internal quotation omitted). Moreover, the

20  Supreme Court has "always been reluctant to expand the concept of substantive due process,"

21  so "where a particular Amendment provides an explicit textual source of constitutional

22  protection against a particular sort of government behavior, that Amendment, not the more

23  generalized notion of substantive due process, must be the guide for analyzing these claims."

24  *Id.* at 842 (internal quotations omitted).

25        Defendants argue that Plaintiff has failed to raise a valid substantive due process claim

26  because none of their actions "shock the conscience." (Mot. 16–17 (Dkt. No. 48).) In her brief

1  in opposition, Plaintiff never responded to this argument. Accordingly, under Federal Rule of

2  Civil Procedure 56(e)(2), "summary judgment should, if appropriate, be entered against"

3  Plaintiff.

4      The Court finds that Plaintiff has failed to raise a viable substantive due process claim

5  and that summary judgment is therefore appropriate. The PAB conclusively determined that

6  Plaintiff violated the DOC's confidentiality policy and that termination was the appropriate

7  disciplinary sanction for this infraction. (PAB Order 9 (Dkt. No. 49-2 at 10).) Accordingly, the

8  Court cannot say that Defendants actions were so egregiously arbitrary as to "shock the

9  conscience" and violate substantive due process. *Sacramento*, 523 U.S. at 846. Therefore, the

10 Court GRANTS Defendants' motion for summary judgment as to Plaintiff's substantive due

11 process claim.

12      **D.    Defamation**

13      The final claim on which Defendants move for summary judgment is Plaintiff's

14 allegation that "[t]he DOC Defendants, acting-in-concert, and without justification, falsely

15 accused [Plaintiff] of dishonesty, lack of integrity, and lack of accountability." (Am. Compl.

16 ¶ 120 (Dkt. No. 2 at 34).) The complaint does not specifically identify any statements for

17 which Defendants are to be held liable, and Plaintiff has not brought any defamatory

18 statements to the Court's attention in defending this motion for summary judgment; as a result,

19 Plaintiff has failed to raise a genuine issue of material fact as to this claim. Moreover, to the

20 extent that Plaintiff's defamation claim is based on Ms. Fiala's statement in her final

21 termination letter that she had been "shocked throughout this process, not only by [Plaintiff's]

22 indiscretion with regard to the incident, but particularly with [her] lack of integrity and

23 forthrightness," the claim is precluded by collateral estoppel. The PAB conclusively

24 determined that Ms. Sutliff's account of the conversation was "consistent and credible" and

25 that Plaintiff's account therefore was not (PAB Order 6 (Dkt. No. 49-2 at 4)); in light of these

26 findings, no reasonable factfinder could find that Ms. Fiala's statements constituted

1  defamation. Accordingly, Defendants' motion for summary judgment as to Plaintiff's

2  defamation claim is GRANTED.

3  **III.     CONCLUSION**

4       For the foregoing reasons, the Court GRANTS Defendants' Motion for Partial

5  Summary Judgment in its entirety. (Dkt. No. 48.)

6       DATED this 28th day of May, 2009.

John C. Coughenour
UNITED STATES DISTRICT JUDGE